IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ANGIE R. LUCAS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CASE NO. CV00-HGD-2291-S |
| | ) | |
| JIM WALTER RESOURCES, INC.; | ) | |
| J. DEAN ARMSTRONG, | ) | |
| | ) | |
| Defendants | ) | |

**ENTERED**
MAY 0 3 2002

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendants [Doc. #32]. This matter is before the undersigned United States Magistrate Judge based on the consent of the parties pursuant to Fed.R.Civ.P. 73.

In her complaint [Doc. #1], plaintiff, Angie R. Lucas, alleges that she was employed by defendant, Jim Walter Resources (JWR), for approximately eighteen (18) months until she was terminated on July 6, 2000. She alleges that she was the victim of sexual harassment occurring on July 3, 2000, and committed by JWR employee, defendant J. Dean Armstrong.

Lucas states that on July 3, 2000, she was seated at her desk at about 7:30 in the morning preparing reports for a meeting. She alleges that at that time, Armstrong walked behind her and put his hand down her shirt, into her bra, leaving $25 inside her shirt. According to Lucas, she grabbed his hand and turned around, stating, "Dean, I thought you were supposed to be in a meeting." He responded, "Well, that makes my dick hard." She states she could feel



his penis up against her back. She was seated in a low-back chair. [Depo. of Angie Lucas at 123-24]. She said, "I think you need to go to your meeting." Armstrong then told her to go to the store and get him a carton of cigarettes. [*Id.* at 120]. According to Lucas, there was no one else in the office at that time to witness the event. [*Id.* at 121].

Lucas testified that she got the cigarettes and returned to the office. At that time, Armstrong was seated at his desk, on the telephone. She gave him his cigarettes and change. At that time, Armstrong tried to run his hand up her left leg, under her overalls. She slapped his hand. [*Id.* at 129, 131-32]. According to Lucas, during the course of the day, Armstrong allowed the other employees leave early, leaving her alone with Armstrong. [*Id.* at 135]. Plaintiff asked Armstrong if she could leave early. She states that he told her, "No, you don't need to leave right now." [*Id.*].

Plaintiff testified that, after everyone else had left, Armstrong called her into his office. At that time, she states that Armstrong got out of his chair, walked around his desk and closed the door. As she heard the door shut, she turned around and saw Armstrong unzip his pants and pull out his penis. She states that she immediately got out of her chair and tried to leave the room, but he blocked the door and would not let her leave. [*Id.* at 145, 152, 154]. He then stated that his testosterone level was up and he was horny. According to plaintiff, he then stated that "if you will play with my dick maybe you'll get horny." As Lucas was trying to get the door handle, he then grabbed her hand and tried to put it on his penis.

Lucas testified that, during this altercation, Armstrong also stated "Just come over here, and we'll go behind my desk" and "With a mouth like yours, I bet you could suck a mean dick."

2

He is also purported to have said, "Why don't we go in the girls' bathroom. You go in there, then I'll come in there right behind you, and we'll lock the door." Lucas responded that she did not want to be there with him and asked him to let her out. [*Id.* at 157-58]. At that time he tried to take one of her hands and put it on his penis. He then tried to put one of his hands down her overalls. Plaintiff was finally able to get the door open, break free of his grip and leave. [*Id.* at 145-46].

When Lucas returned to work on July 6, 2000, she began working with Carol Watts on a project. However, she had to leave for a doctor's appointment shortly after arriving. She was called later that day and told not to come back to work. Plaintiff states that she was shocked by this because she had just begun to work with Carol Watts on a new program that was supposed to last for several weeks. [Affid. of Angie Lucas].

## Discussion

Defendant's first contention is that summary judgment is appropriate because plaintiff was not an employee of JWR in the sense that this term is used in Title VII. The status of a plaintiff as an employee or independent contractor under Title VII is a question of federal law, "to be ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand." *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 339 (11th Cir.), *cert. denied*, 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982), *quoting Calderon v. Martin County*, 639 F.2d 271, 272-73 (5th Cir. 1981).

Title VII defines "employee" to mean "an individual employed by an employer . . ." 42 U.S.C. § 2000e(f). There is no further elaboration nor any legislative history to guide this determination. Therefore, the Eleventh Circuit has determined that Congress intended the term "employee" to be given its common, everyday meaning. *Cobb*, 637 F.2d at 339. In *Cobb*, the Eleventh Circuit adopted the common law agency test in analyzing whether a plaintiff is an employee or independent contractor. "[T]he economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee . . . are determinative." 673 F.2d at 341. Defendants contend that if Lucas was an independent contractor, rather than an agent or employee of JWR, then there would be no "employment relationship" between the two, and she cannot avail herself of Title VII's protections.

The Eleventh Circuit has adopted a checklist of factors relevant to the court's consideration of this question: (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, *i.e.*, by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates

retirement benefits; (10) whether the "employer" pays Social Security taxes; (11) the intention of the parties. *Id.* at 340.

Plaintiff states that there are several events which create a question of fact as to whether she was an employee or a private contractor. However, after applying the factors set out in *Cobb* to this case, the undersigned finds that these events are insufficient to create a question of fact.

Plaintiff was working as a data entry operator. She was inputting information into the JWR computer system to create computer records of data formerly kept in paper documents, such as three-by-five cards. With regard to this job, plaintiff states that she was not working for anyone else besides JWR, reported to the sites at which she was told to work, and was supervised by a JWR employee. However, the work performed by plaintiff, data entry, was not an integral part of the business of JWR, which is coal mining.

The nature of plaintiff's work was such that it really did not require a great deal of supervision. In addition, when she moved from one area to another within JWR, her "supervisor" changed to whomever was the head of that particular department. Furthermore, she never had any annual performance reviews by these supervisors, unlike all regular JWR employees. [Affid. of Roger Armbrester]. Likewise, plaintiff did not have an office or even her own desk or computer. She was required to make use of whatever was available in the department where she was assigned at any given time.

Plaintiff also states that further proof of her employee status is shown by the fact that she kept her own time sheet, which identified her as a non-exempt hourly employee. Furthermore,

she states that as of February 2000, one of JWR's own documents refers to her as a salaried employee with a seniority date. However, the fact that she kept her own time sheets rather than having her hours worked tracked by JWR is more indicative of independent contractor status than employee status. Furthermore, plaintiff herself testified that she was always paid on an hourly basis, despite the JWR record indicating she was a salaried employee. Obviously, that document is simply incorrect. Furthermore, she kept track of her hours worked and turned in an invoice and time-sheet reflecting those hours every Friday. Unlike regular employees who were paid every other Thursday, plaintiff was paid any time she turned in an invoice. [Depo. of Angie Lucas at 62-63, 184]. When plaintiff finished one job, she was laid off for seven (7) days until more work was available; on another occasion, she was laid off for approximately a month. [*Id.* at 190-91].

In addition, at the time she was hired, plaintiff was not required to complete the new-hire paperwork required of regular employees, including such things as tax forms. She was never given the employee handbook given to all regular JWR employees. When she was paid by JWR, no withholding taxes were taken out, and she was paid through accounts-payable as were other vendors and contractors, rather than through the payroll department as regular employees were paid. At the end of each year, she received an IRS form 1099 which labeled her pay as "non-employee compensation." [Exh. E to Affid. of Roger Armbrester]. These forms reflect that Lucas received compensation from JWR of $1829.63 for the year 2000 and $3914.75 for 1999. Unlike regular JWR employees, Lucas received no employee benefits, no paid holidays or sick days and she was ineligible to join the labor union.

6

Another relevant event involved the means that JWR used to inform employees about the company's policy against sexual harassment. On at least two occasions while plaintiff worked at JWR, management informed employees about the sexual harassment policy by including a flyer containing this information in the envelopes with their paychecks. Plaintiff testified that she never received any such information. [Depo. of Angie Lucas at 270; Affid. of Angie Lucas]. In addition, she was never listed on the employee roster. [Affid. of Roger Armbrester]. This reflects that JWR did not consider her to be an employee. Likewise, though this information was posted on the company bulletin board, plaintiff never bothered to see what information was contained on it, despite passing by it every day. The implication from this is that there was no information on it that would be of any interest to her because she did not consider herself an employee. In addition, she never attended any employees' meetings. [*Id.*].

A conclusion that Lucas was an independent contractor rather than an employee is further borne out by her testimony, as follows:

> Q. And as I understand from all of your pleadings, you were a contract employee, correct?
>
> A. Yes

[Depo. of Angie Lucas at 45].

> Q. Let's talk briefly about your employment with Jim Walter. We touched on this a minute ago, but you understood throughout your employment that you were a temporary, contract employee?
>
> A. Yes.

7

> Q. And you would continue to work as long as there was temporary data entry projects to do?
>
> A. Yes.
>
> Q. You were paid only for the times that you actually worked?
>
> A. Yes.

[*Id.* at 56].

Plaintiff asserts in her affidavit that she never considered herself to be self-employed but always considered herself to be an employee of JWR. However, this is, without explanation, directly contrary to her prior deposition testimony outlined above. When a party has given clear answers to unambiguous questions, that party cannot thereafter create an issue of fact with an affidavit that merely contradicts, without explanation, previously given clear testimony. *Telfair v. First Union Mtg. Corp.*, 216 F.3d 1333, 1342 (11th Cir. 2000), citing *Van T. Junkins & Assocs. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

Applying these facts to the factors set out in *Cobb, supra*, leads to only one conclusion: that plaintiff was not an employee of JWR, as a matter of law. Therefore, summary judgment is due to be granted with respect to the alleged violation of Title VII. Likewise, the Title VII claim against Armstrong is due to be dismissed on summary judgment because there is no individual liability under that Act. *See Edwards v. Wallace Comm. College*, 49 F.3d 1517 (11th Cir. 1995).

CONCLUSION

Based on the foregoing, it is ORDERED, ADJUDGED and DECREED that defendants' Motion for Summary Judgment is due to be and hereby is GRANTED with respect to the claimed violations of Title VII. The Court specifically DECLINES to exercise supplemental jurisdiction over the state law claims asserted by plaintiff; therefore, it is further ORDERED, ADJUDGED and DECREED that plaintiff's state law claims are due to be and hereby are DISMISSED WITHOUT PREJUDICE.

DONE this 2nd day of May, 2002.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE